Present:  All the Justices

CHRISTOPHER BECK

OPINION BY JUSTICE LAWRENCE L. KOONTZ, JR.

v. Record No. 962431                    APRIL 18, 1997

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
William T. Newman, Jr., Judge

In this appeal, we review the capital murder convictions and the death sentences imposed by the trial court, sitting without a jury, on Christopher Beck.  The principal issues presented are whether the trial court erred in receiving "victim impact evidence" from persons other than family members of the victims and in receiving "recommendations" concerning the imposition of the death penalty from the victims' friends and family members.

## I. PROCEEDINGS

Beck was charged with multiple offenses including capital murder, burglary, rape, robbery, and use of a firearm in the commission of these offenses.  Prior to trial, Beck filed a motion to suppress the introduction of all statements made by him to the police and any evidence obtained as a result.  After reviewing the statements, receiving additional evidence, and hearing argument of counsel, the trial court denied this motion.  Beck does not assign error to this action of the trial court.

Beck also filed a motion challenging the constitutionality of Virginia's capital murder statute and the attendant statutes governing trial and appellate procedures in death penalty cases. The trial court denied this motion without comment.

At trial, Beck pled guilty to the capital murder of his

cousin Florence Marie Marks during or subsequent to rape or in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(4) and (5), the capital murder of William Miller in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(4), the capital murder of David Stuart Kaplan in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(4), as well as statutory burglary, rape, three offenses of robbery, and seven offenses of the use of a firearm.[*] At the time the pleas were taken, the Commonwealth, at the trial court's direction, made a proffer of the evidence of Beck's guilt. This proffer referred the trial court principally to statements made by Beck to the police which the trial court had reviewed during the suppression hearing. On the basis of this proffer, the trial court accepted the pleas and found Beck guilty.

Following the acceptance of Beck's pleas, the trial court granted a continuance prior to beginning the sentencing phase of the trial. During the continuance, the trial court received a large number of letters from family members and friends of the victims which contained statements concerning the impact of Beck's crimes and "recommendations" concerning the imposition of the death penalty.

During the sentencing phase, the trial court heard evidence in aggravation and in mitigation and fixed punishment for each of

---

[*]Beck also pled guilty to the capital murder of the three victims as part of a single act or transaction, Code § 18.2-31(7); that capital multiple murder charge was subsequently nolle prossed and Beck's plea withdrawn. See Clagett v. Commonwealth, 252 Va. 79, 96, 472 S.E.2d 263, 273 (1996).

the three capital murders at death premised upon findings of both "vileness" and "future dangerousness." The trial court sentenced Beck to four life terms plus a total 53 years' imprisonment for the remaining offenses.

## II. EVIDENCE

The critical facts are not in dispute and may be fairly summarized as follows:

A. Beck's Statements to Police

Beck told police that several days before the murders he formulated a plan to kill Miller, Beck's former employer. On Monday, June 5, 1995, Beck traveled by bus from his home in Philadelphia, Pennsylvania, to Washington, D.C., arriving there at 6 p.m. The following morning Beck went to Arlington to the house shared by Marks, Miller, and Kaplan. He arrived at the house at 11 a.m., "walked around the perimeter," and then broke in through a basement window under the porch.

Wrapping a sledge hammer he found in the basement with a cloth to "muffle the sound," he used the sledge hammer to batter a hole in a door to the first floor of the house. Beck then went to Miller's apartment and chose a .22 caliber semi-automatic pistol from several loaded guns Miller kept in the house; he rejected another larger caliber weapon because its report would be too loud. After loading a spare magazine for the pistol, Beck went to the basement and waited for Miller to return home. As Beck waited he became "nervous," but finally concluded, "I guess I'll go through [with] it."

Later that afternoon, Beck heard the sound of someone

entering the basement.  Beck raised the pistol to "arm level,"
and, as the door opened, he closed his eyes and fired two shots.
 When Beck opened his eyes, he saw Marks on the basement floor.
Beck said, "you stupid bitch, why did you have to come home?"  In
an attempt to make it appear that Marks had been raped and
robbed, Beck cut off most of her clothes and stabbed her in the
right buttock.  He threw a condom he had found in the washer onto
the floor and, in a further effort to make it appear that Marks
had been sexually assaulted, he kicked her and penetrated her
vagina with a hammer.  Beck reasoned that sexual assault evidence
would lead the police to believe that the crime had been
committed by a stranger and not by a family member.  Beck then
went back upstairs to the first floor.

About one hour later, Miller returned home.  Beck was on the
stairs leading to the second floor and hid behind the bannister.
 Miller remained downstairs for a while and then started up the
stairs.  Beck shot Miller in the face as he mounted the stairs.
Miller fell down the stairs as Beck continued to shoot him,
firing a total of five rounds at him.  Beck put Miller's body in
Kaplan's apartment and threw a blanket over the body, "because I
got sick and tired looking" at it.

Later that evening, but while it was still light outside,
Kaplan returned home to find Miller's body lying in his room,
Beck with a gun in his hand, and blood "all over."  As Kaplan
stared at the scene, Beck shot Kaplan in the back of the head.
Beck fired "several times and [Kaplan] just wouldn't die."  As
Kaplan lay on the floor, he talked to Beck, saying, "hello, I'm

awake, hello."  Beck fired what he believed was a full magazine at Kaplan and then stabbed him in the head.  Beck stated that he "just wanted [Kaplan] to stop having the pain."  After he was stabbed, Kaplan appeared to have a "seizure" and then died.

Beck went back through the house taking several guns and two bicycles.  He also took cash from each of the victims.  He took the keys to Miller's car, changed his clothes, loaded the car with the guns and bicycles, and drove to Washington, D.C., to see a girl.  As he left the house, Beck waved to the next door neighbor.

After a parking mishap in the District of Columbia in which Beck parked the car but neglected to engage the parking brake, and the car rolled into another vehicle, Beck drove home to Pennsylvania.  Once there he hid the guns and "stashed" the bicycles with a friend.  He "cleaned the car of all prints[,] wiped it all down," and abandoned it after covering the license plates.

Beck was initially interviewed by Arlington County Police officers at his mother's home in Philadelphia.  Beck at first claimed to have been transporting bicycles from Tennessee at the time of the murders.  When a friend failed to corroborate Beck's alibi, Beck admitted to police that he had killed Marks, Miller and Kaplan.  After his arrest, Beck was returned to Arlington, where he gave a full statement concerning the murders to police.  During his statement to the police, Beck was given a chance to say something for himself; he said:

> That ah I know what is like to kill somebody, its
> one of the worst feelings you can live with that I

don't know that it is pretty painful that is one of those things that you can't go to sleep and I'm so sorry that I did, I'm so sorry that I had all that anger built up, I should had went to a counselor or something could have prevented it. I don't know, I'm sorry but I know this is going to be pretty hard for people to believe what happened.

In addition to giving that statement, Beck assisted the police in the recovery of the stolen car, guns, and bicycles.

B. Additional Evidence

Autopsies of the three victims revealed that each had suffered multiple gunshot wounds to the head which had resulted in rapid, if not immediate death. Dr. Frances Patricia Field, an assistant chief medical examiner, testified that Marks had sustained two gunshot wounds to the head. Dr. Field concluded that either of these gunshot wounds could have been lethal. In addition, the autopsy revealed that Marks had sustained multiple bruises on her body, a stab wound in the right buttock, and "hyperemia or redness in the left back part of the entrance to the vagina."

Miller's autopsy revealed bruises and abrasions of the lower extremities and several gunshot wounds to the face. Dr. Field concluded that the bullet which entered the left side of the head would have caused death "relatively quick[ly] if not instantaneously."

Kaplan's autopsy revealed the presence of seven gunshot wounds. Kaplan had sustained wounds to the left side of the head, the left and right sides of the face, the left side of the chin, the top and right side of the nose, and the left upper chest. In the medical examiner's opinion, only the bullets which

entered the chest and the head below the ear would have been immediately or rapidly fatal. Dr. Field was unable to determine the order in which the wounds had been inflicted.

At the time the plea was taken, in addition to referring the trial court to Beck's statements, the Commonwealth made the proffer that a used condom found in the house was analyzed and that genetic material of both Marks and Beck was found. This evidence was in direct conflict with Beck's statement concerning the rape of Marks.

At sentencing, the trial court received evidence of Beck's prior criminal history. Beck, at the age of 14 years, was charged with aggravated assault after he pushed his high school teacher, Joyce Leff, as he left her class. According to Ms. Leff, Beck was "hostile towards authority, didn't want to do any class work." Beck wore "a jacket with swastikas on it" until a school vice principal asked him not to wear it. When Beck told Leff that he had guns he "used to target shoot the neighbor's house," she became "very afraid" and re-arranged her classroom so that she was not visible from outside the classroom. Leff further testified that Beck was in a special education class and read on a first or second grade level; she felt he was "emotionally disturbed . . . [v]ery hostile, full of rage and anger." Beck subsequently was committed to the Pennsylvania Department of Welfare in 1991 after an incident in which he threatened to harm his former girlfriend and her parents. While in the jail segregation unit awaiting the present trial, Beck substituted disinfectant for mouthwash belonging to one inmate

and struck another inmate.  In addition, Beck wrote a document describing his feelings in which he incorporated the phrase: "I'm sorry but I love killing."

Dr. Dewey G. Cornell, a clinical psychologist and professor at the University of Virginia, diagnosed Beck as learning disabled, suffering from attention deficit and hyperactivity disorder (ADHD), and antisocial personality disorder.  Dr. Evan Nelson, a licensed clinical psychologist specializing in forensic psychology, also concluded that Beck suffers from ADHD and a learning disability.  Dr. Nelson did not conclude that Beck suffers from antisocial personality disorder, but conceded that he met all the criteria for such a diagnosis.  He opined that neglect by Beck's mother was the primary cause of Beck's pathology.  According to Dr. Nelson, Beck is able to express regret but lacks the capacity to experience remorse.

C. Victim Impact Evidence

Prior to sentencing, Beck's attorney asked the trial court not to consider "victim impact" type evidence submitted by persons other than members of the victims' families.  The trial court observed that the decision in Payne v. Tennessee, 501 U.S. 808 (1991), permitted it to "go either way."  The trial court indicated that it would be necessary to review the materials to make a determination of their admissibility, and that the court would make its decision based upon the closeness of the relationship between the victim and the witness.  Beck renewed the objection to non-family victim impact evidence at the outset of the sentencing hearing, but did not raise express objections

to any specific evidence or testimony.

Among the documents received by the trial court were letters from family members, co-workers, and friends of the victims, and numerous letters sent to Kaplan's parents. Included with these were news accounts and essays written by co-workers of Kaplan, who was a journalist. Some of the letters included the authors' views favoring imposition of a death sentence or life imprisonment.

## III. ISSUES WAIVED

Beck assigns error to the trial court's denial of his motion to declare Virginia's death penalty statute unconstitutional and to prohibit imposition of the death penalty on the ground that Virginia's procedures for trial and appellate consideration of the death sentence are also unconstitutional and violate the Eighth Amendment's prohibition against cruel and unusual punishment and the 14th Amendment's guarantee of due process. These assignments of error seek to raise issues that Beck waived by the entry of his guilty pleas and, thus, they are not cognizable in this appeal. See Murphy v. Commonwealth, 246 Va. 136, 141, 431 S.E.2d 48, 51, cert.denied, 510 U.S. 928 (1993); Savino v. Commonwealth, 239 Va. 534, 539, 391 S.E.2d 276, 278-79, cert. denied, 498 U.S. 882 (1990); Stout v. Commonwealth, 237 Va. 126, 131-32, 376 S.E.2d 288, 291, cert. denied, 492 U.S. 925 (1989).

## IV. VICTIM IMPACT EVIDENCE

Beck asserts that it was improper for the trial court to receive victim impact evidence from persons not related to the

victims.  Beck's initial position is that such evidence is constitutionally barred because it exceeds the scope of victim impact testimony permitted by the United States Supreme Court's decision in Payne.  Beck further asserts that even if not constitutionally barred, admission of such evidence is not permitted under Virginia's criminal procedure code.  We will consider each of these assertions in turn.

A. Constitutional Admissibility

We have previously decided that "victim impact testimony is relevant to punishment in a capital murder prosecution in Virginia."  Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 389-90 (1994), cert. denied, 516 U.S. ___, 116 S.Ct. 100 (1995).  There, we relied on the statement in Payne that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the . . . decision as to whether or not the death penalty shall be imposed."  501 U.S. at 827.

Citing the foregoing language in Payne, Beck maintains that Payne limits the source of victim impact evidence to family members.  We disagree.  No such limitation is either express or implied by this language.  To the contrary, the Court was describing the nature, not the source, of victim impact evidence.  Indeed, it has been expressly recognized that the impact of the loss of the victim of a murder may extend beyond the victim's family members to the victim's friends and community.  Id. at 830 (O'Connor, J., concurring).  Human experience and common knowledge support this recognition of the unique worth of the

individual.  Thus, there is no merit to Beck's assertion that victim impact evidence is constitutionally limited to that received from the victim's family members.

We hold that the admissibility of victim impact evidence during the sentencing phase of a capital murder trial is limited only by the relevance of such evidence to show the impact of the defendant's actions.  While statements from the immediate family members of the deceased will normally be the best source of such evidence, the Eighth Amendment does not restrict the trial court from looking to statements of others well acquainted with the victim.  Such evidence provides the sentencing authority with an understanding of the individualized circumstances present in the life of the victim and the specific harm caused by the crime in question.  Id. at 825.  So long as its prejudicial effect does not outweigh its probative value, such evidence is beneficial to the determination of an individualized sentence as is required by the Eighth Amendment.  Id.; see also Wesley v. State, 916 P.2d 793, 804 (Nev. 1996)(victim impact evidence from neighbors, co-workers and others did not violate defendant's Eighth Amendment rights).

B. Statutory Admissibility

Beck asserts that even if constitutionally permissible, the criminal procedure provisions within Title 19.2 of the Virginia Code limit victim impact evidence in a capital murder case to that received from the victim's family members.  In support of this position, Beck relies upon Code §§ 19.2-11.01, 19.2-264.5 and 19.2-299.1.  Beck asserts that, when read in concert, these

three statutes provide only for gathering and presentation of evidence from those persons designated as "victims" under the Crime Victim and Witness Rights Act (the Act). Code § 19.2–11.01 to –11.4. We disagree.

Pertinent to our resolution of this issue, the code prescribes:

**§ 19.2-11.01. Crime victim and witness rights.**

A. In recognition of the Commonwealth's concern for the victims and witnesses of crime, it is the purpose of this chapter to ensure that the full impact of crime is brought to the attention of the courts of the Commonwealth;

. . . .

4. Victim input.

a. Victims shall be given the opportunity, pursuant to § 19.2–299.1, to prepare a written victim impact statement prior to sentencing of a defendant and may provide information to any individual or agency charged with investigating the social history of a person or preparing a victim impact statement under the provisions of §§ 16.1–273 and 53.1–155 or any other applicable law.

. . . .

B. For purposes of this chapter, "<u>victim</u>" means. . . a spouse, parent or legal guardian of such a person who . . . was the victim of a homicide.

**§ 19.2-264.5. Post-sentence reports.**

When the punishment of any person has been fixed at death, the court shall, before imposing sentence, direct a probation officer of the court to thoroughly investigate the history of the defendant and any and all other relevant facts, to the end that the court may be fully advised as to whether the sentence of death is appropriate and just. Reports shall be made, presented and filed as provided in § 19.2–299 except that, notwithstanding any other provision of law, such reports shall in all cases contain a Victim Impact Statement. Such statement shall contain the same information and be prepared in the same manner as Victim Impact Statements prepared pursuant to

§ 19.2-299.1.  After consideration of the report, and upon good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life.

**§ 19.2-299.1. When Victim Impact Statement required; contents; uses.**

The presentence report prepared pursuant to § 19.2-299 shall, with the consent of the victim, as defined in § 19.2-11.01, in all cases involving offenses other than capital murder, include a Victim Impact Statement.  Victim Impact Statements in all cases involving capital murder shall be prepared and submitted in accordance with the provisions of § 19.2-264.5.

A Victim Impact Statement shall be kept confidential and shall be sealed upon entry of the sentencing order.  If prepared by someone other than the victim, it shall . . . provide such other information as the court may require related to the impact of the offense upon the victim.

Beck asserts that by limiting the definition of "victim" in the Act to the "spouse, parent or legal guardian" of the deceased, the legislature implicitly intended to limit the admissibility of victim impact evidence to that provided by such persons for the reports described in Code §§ 19.2-264.5 and 19.2-299.1.  There is no merit to this assertion.

While the Act provides for the right of victims, as defined therein, to prepare a written impact statement, nothing within the Act limits the nature of victim impact evidence to such statements alone.  Similarly, the reference to the Act in Code § 19.2-299.1 merely defines the person or persons whose consent the Commonwealth must obtain in order to include the victim impact statement in the sentencing report.  Moreover, by its express terms Code § 19.2-299.1 exempts the Commonwealth from having to obtain such consent in capital murder trials, and the

preparation of a victim impact report in a capital murder trial, though done in the same manner as other such reports under Code § 19.2-299.1, is mandated by Code § 19.2-264.5.

The clear import of the Act is to preserve the right of victims of crimes to have the impact of those crimes upon their lives considered as part of the sentencing process, if that is their wish, and to protect their privacy thereafter. The requirement in Code § 19.2-299.1 of obtaining victim consent to include the statement of the victim in the pre-sentence report is further recognition of the right of victims to maintain their privacy if they so desire. By exempting the Commonwealth from having to seek such consent when presenting victim impact evidence during capital murder trials, the legislature has recognized expressly that the impact of such crimes is of such magnitude as to require the consideration of victim impact evidence even at the risk of intruding upon the sensibilities of those closest to the victim.

Nothing in Code § 19.2-299.1 expressly or implicitly limits the sources on which the Commonwealth may draw in its preparation of the victim impact portion of the presentence report. Rather, the report is to contain whatever information the trial court "may require related to the impact of the offense upon the victim."

Accordingly, we hold that the statutes do not limit evidence of victim impact to that received from the victim's family members. Rather, the circumstances of the individual case will dictate what evidence will be necessary and relevant, and from

what sources it may be drawn.  In a capital murder trial, as in any other criminal proceeding, the determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion.  See Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986); Stamper v. Commonwealth, 220 Va. 260, 269-70, 257 S.E.2d 808, 815-16 (1979), cert. denied, 445 U.S. 972 (1980).

C. Admissibility and Consideration of Evidence Received

We now turn to the victim impact evidence actually received by the trial court during the sentencing phase of Beck's trial. In doing so, we stress that this was a trial without a jury.  In responding to Beck's generalized objections to its receiving victim impact evidence, the trial court stated that it would assess each statement to determine whether the relationship of the declarant to the victims was sufficient to warrant the trial court's consideration, limiting that consideration to the testimony of family members and close friends of the victims. The trial court further stated that it was "mindful of the types of statements that would be inappropriate for its consideration."

Although provided with the opportunity to review the victim impact evidence prior to sentencing, Beck did not raise any particularized objection to the admission of any statement or testimony.  Accordingly, we need only consider whether the trial court erred in considering the evidence received.

As noted above, the determination of admissibility of relevant evidence is within the sound discretion of the trial court.  In order to exercise that discretion, the trial court

must weigh the relevance and probative value of the evidence against its potential undue prejudice to the defendant.  "A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments and to separate, during the mental process of adjudication, the admissible from the inadmissible, even though he has heard both."  Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981); see also Williams v. Commonwealth, 234 Va. 168, 182, 360 S.E.2d 361, 369 (1987), cert. denied, 484 U.S. 1020 (1988).  Here, the trial court's statements clearly establish its awareness of this responsibility.

In reviewing an exercise of discretion, we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action.  We find that none of the declarants of the victim impact evidence received by the trial court was so far removed from the victims as to have nothing of value to impart to the court about the impact of these crimes.  Thus, the determination that this evidence was relevant and probative of the issue under consideration was clearly within the trial court's discretion.  Similarly, our review of the content of the victim impact evidence reveals no statement concerning the impact of the crimes so inherently prejudicial that its admission would constitute an abuse of discretion.  Accordingly, to whatever extent that the trial court chose to consider the evidence it received, we cannot say that doing so constituted an abuse of its discretion.

D. Evidence of "Recommendations" for Imposition of Death Penalty

Beck further asserts that the trial court erred in considering statements contained within the victim impact evidence which "recommended" the imposition of the death penalty. The mere fact that the trial court received statements from family and friends of the victims in which the imposition of the death penalty was urged as an appropriate sentence does not establish that the trial court relied upon those statements in reaching its judgment. See Smith v. Commonwealth, 239 Va. 243, 268, 389 S.E.2d 871, 885, cert. denied, 498 U.S. 881 (1990). Moreover, the trial judge, by virtue of his training and experience, is presumed to have separated the permissible victim impact evidence from any potentially prejudicial statements, if any, concerning sentencing and to have considered only the former.[**] The record amply supports the conclusion that this was done in this case and that the trial court's judgment was not made in an arbitrary manner.

## V. SENTENCE REVIEW

Beck's remaining assignments of error challenge the imposition of the death sentences on the ground that the evidence failed to establish the predicate determinations of future dangerousness and vileness and that the sentences were excessive and were imposed under undue influence of passion.

---

[**]We do not mean to suggest that we agree with Beck's characterization of the lay witnesses' statements with regard to the imposition of the death sentence in this case as "recommendations" to the trial court, or that the trial court received them as such. Rather, we believe these statements were received by the trial court as expressions of the depth of the witnesses' feelings concerning the impact of these crimes.

A. Sufficiency of the Evidence to Support Predicate Determination

The record contains sufficient evidence to support the trial court's finding of future dangerousness.  Beck attempts to minimize the evidence of his prior criminal history and subsequent violent acts while incarcerated.  This evidence, however, must be considered not in isolation, but in the context of the present offenses.  The circumstances surrounding the commission of the capital murder of Miller were sufficient to establish beyond a reasonable doubt that Beck would commit future criminal acts of violence that would constitute a continuing threat to society.  See Code § 19.2-264.4(C); Murphy, 246 Va. at 144, 431 S.E.2d at 53.  By his own admission, Beck planned and executed that murder, in the process killing his cousin Marks, and then remaining at the crime scene to kill Kaplan.  These facts, along with the evidence of Beck's prior and subsequent actions, provided sufficient evidence from which the trial court could conclude that Beck placed no value on human life and would kill others whenever it suited him to do so.  See Goins v. Commonwealth, 251 Va. 442, 468, 470 S.E.2d 114, 131, cert. denied, 519 U.S. ___, 117 S.Ct. 222 (1996).

Beck's sole contention with respect to the determination of vileness is that the term is unconstitutionally vague.  We have already addressed and rejected this argument in Breard v. Commonwealth, 248 Va. 68, 74, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 971 (1994).  A finding of "vileness" must be based on conduct which is "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an

aggravated battery to the victim."  Code § 19.2-264.2.  Proof of any one of these three components will support a finding of vileness.  Id.; Mueller v. Commonwealth, 244 Va. 386, 411, 422 S.E.2d 380, 395 (1992), cert. denied, 507 U.S. 1043 (1993).  We hold that the evidence sufficiently established Beck's depravity of mind to warrant a finding of vileness.

B. Proportionality Review

Code § 17-110.1(C) requires us to review the death sentences imposed on Beck to determine whether (1) they were imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) they are excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.  We will combine the review required by statute with the identical issues raised by Beck in his appeal.

In support of his contention that the death sentences were imposed under the influence of passion, prejudice, or other arbitrary factor, Beck asserts that the trial court failed to give consideration to mitigating evidence.  This argument is merely conclusory and we find nothing in the record to support it.  To the contrary, the record contains the trial judge's statement that he "carefully considered the aggravating and the mitigating circumstances found to exist in this case," and the judgment orders state that the trial court took into consideration "all of the evidence in the case."  See Boggs v. Commonwealth, 229 Va. 501, 522, 331 S.E.2d 407, 422 (1985), cert. denied, 475 U.S. 1031 (1986).  Additionally, our independent review of the trial record fails to disclose that the sentences

of death were imposed under the influence of any of the statutory factors.

In conducting our proportionality review, we must determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993); see also Code § 17-110.1(C)(2). We have examined the records of all capital murder cases reviewed by this Court, under Code § 17-110.1(E), including those cases in which a life sentence was imposed. We have given particular attention to those cases in which the death penalty was based on both the "future dangerousness" and the "vileness" predicates.

Based on this review, we conclude that Beck's death sentences are not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth for comparable crimes. See, e.g., Jenkins, supra; Briley v. Commonwealth, 221 Va. 563, 273 S.E.2d 57 (1980); Stamper, supra.

## VI. Conclusion

We find no reversible error in the judgments of the trial court. Having reviewed Beck's death sentences pursuant to Code § 17-110.1, we decline to commute the sentences of death. Accordingly, we will affirm the trial court's judgments.

Affirmed.