COURT OF APPEALS OF VIRGINIA

Present:  Judges Russell,* Friedman and Callins
Argued at Salem, Virginia

LARRY DALE PUCKETT

MEMORANDUM OPINION** BY
v.       Record No. 1002-21-3            JUDGE FRANK K. FRIEDMAN
                                          AUGUST 9, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PATRICK COUNTY
Marcus A. Brinks, Judge

Jason S. Eisner for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Larry Puckett ("appellant" or "Puckett") was convicted of malicious wounding following

a bench trial in the Circuit Court of Patrick County.  He was sentenced to twenty years in prison

with eight years suspended.  He was also ordered to complete five years of probation and to pay

$22,691.01 in restitution to the Virginia Department of Medical Assistance Services ("DMAS"),

which paid the medical bills for injuries suffered by Puckett's victim, Justin Hawks.

Puckett now alleges that the trial court erred in three ways:  finding him guilty of

malicious wounding, admitting into evidence a victim impact statement written by a person other

than the victim or his family member, and ordering him to pay restitution to DMAS.

---

* Justice Russell participated in the hearing and decision of this case prior to his
investiture as a Justice of the Supreme Court of Virginia.

** Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Background

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). This Court must reject any of appellant's evidence that conflicts with that of the Commonwealth, and instead "regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* at 473 (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)). Keeping these principles in mind, the following evidence was presented at appellant's trial.

The Malicious Wounding Conviction: An Unpleasant Houseguest is Told to Leave and a Violent Altercation Ensues

Puckett and Justin Hawks ("Hawks") had known each other for about ten years. Puckett came to stay at Hawks' residence for a few days in October 2019. However, he proved to be an unpleasant guest and eventually Hawks asked Puckett to leave. Puckett left but returned several times that same day. He was "acting crazy" and making threats to "[c]ut everybody's head off."

Hawks' repeated attempts to get Puckett to leave his property resulted in a physical altercation that night outside Hawks' home. According to Hawks, Puckett hit him with a drill bag and then punched him three or four times. Hawks pushed Puckett away, causing him to fall to the ground. The men continued arguing until finally Puckett began walking away from the home.

Hawks, carrying only a flashlight, followed behind Puckett to make sure that he was leaving. Eventually, Hawks turned around to walk back home. As he walked, he saw Puckett lurking in the bushes on the side of the road. The men argued again, then walked away from each other in opposite directions. After a few moments, Hawks heard Puckett run up behind him. Puckett—who is about thirty years Hawks' senior—jumped onto Hawks' back. Hawks

told the attacker: "I'm not going to fight you." Puckett responded: "I'm not fighting you. I'm killing you, motherfucker." As Puckett said this, he stabbed Hawks multiple times. Hawks was able to bring both himself and appellant to the ground, and Hawks then punched appellant once in the jaw.

Hawks ran to the closest house where, as he waited for help, he heard Puckett screaming: "You're a dead motherfucker. I killed you." The homeowners called 911 and rendered medical assistance until emergency responders arrived. Hawks' medical records were introduced into evidence at trial. They reveal that he was stabbed multiple times in the chest and in the arm. Photos of Hawks' injuries supported a conclusion that a savage attack occurred.

Puckett provided a very different description of the altercation. According to Puckett, he and Hawks were having an argument, but when Puckett began to walk away, Hawks attacked him from behind by striking him in the head with an object. Puckett alleged he was able to grab his knife from his pocket and "poke" Hawks with it three times before Hawks could strike another blow. Puckett claimed he remained down on one knee throughout the stabbing. He testified that because he was on one knee, had prior heart problems, and was about thirty years older than Hawks, he feared for his life when he retrieved his knife and stabbed Hawks. Puckett admitted to having six or seven prior felony convictions.

At the close of all the evidence, the trial judge convicted appellant of malicious wounding. The judge made several notable findings in making this ruling: Hawks was not armed with any weapons other than a "fairly small" flashlight, Puckett was angry and did not act in self-defense, and Hawks' wounds "were made towards his lungs and heart" and came from "a series of blows," rather than "one or two to get someone off of you."

<u>Sentencing Issues</u>

<u>The Victim Impact Statement Dispute</u>

At a later sentencing hearing, the Commonwealth submitted victim impact statements written both by Hawks and his live-in girlfriend, Sawyers. Appellant objected, arguing that the girlfriend was "not an appropriate person" to submit a victim impact statement under Code §§ 19.2-299.1 and 19.2-11.01.[1] The Commonwealth responded that she had suffered psychological and economic harm as a result of the stabbing and noted that she was living with Hawks at the time of the incident.

Sawyers' statement was relatively short. In fact, it was only six sentences long. It referenced the strain the injuries placed on the couple's relationship as well as the stress involved in caring for Hawks after he sustained his injuries. Sawyers' statement also discussed hardships she and her daughter faced arising from the attack. Hawks' own impact statement covered much of the same ground—noting his concern over the responsibilities placed on his girlfriend and her daughter by his injuries and his own stress arising from being a burden in his debilitated state. The court overruled appellant's objection, finding that "she is someone who was dealing with the victim and certainly, I think, suffered some kind of . . . psychological harm as a result of these actions." In passing sentence, the court did not reference or appear to rely upon Sawyers' statement in any way.

<u>The Award of Restitution to DMAS</u>

As part of the sentencing hearing, the Commonwealth requested that appellant be ordered to pay $22,691.01 in restitution to DMAS, because "they provided the payment for the physical

---

[1] Appellant's objection focused on the fact that Sawyers was not a first-hand witness to the assault, nor were she and Hawks married. However, appellant also noted that Sawyers' victim impact statement listed her relationship to Hawks as "none." The Commonwealth argued that this was a scrivener's error. The trial court did not make a specific ruling on this issue.

victim's medical treatment." The record showed that there were hospital charges in that amount arising from the attack. Hawks' medical bills and costs were paid, at least in part, by DMAS because Hawks received Medicaid assistance.[2] No specific evidence was presented as to any copays, deductibles, therapy expenses, or other expenses, if any, Hawks may have incurred, although Sawyers' impact statement did discuss the general expense of buying medicine, bandages, and related medical materials before Hawks began receiving Medicaid assistance.[3]

The Commonwealth argued that DMAS could be considered a crime victim under Code § 19.2-11.01 because the agency suffered economic harm as a result of the stabbing. The restitution order listed only DMAS as the "victim"—Hawks received no restitution. Appellant objected, arguing that "the restitution statute is geared towards making whole the aggrieved party here" and that DMAS was not a proper recipient of restitution under the Code. Appellant also noted that DMAS could pursue civil remedies against appellant for the cost of Hawks' medical services but that Virginia case law permitting restitution for insurance company reimbursements was limited to property damage or loss under Code § 19.2-305.1. The court took both parties' arguments under advisement and subsequently issued a letter opinion finding that Code

---

[2] DMAS is an agency created by the legislature in Virginia and supervised by the Secretary of Health and Human Services. Code § 32.1-323; 12 Va. Admin. § Code 30-10-10. DMAS is the state agency authorized to administer Virginia's Medicaid Program under Title XIX of the Social Security Act. 12 Va. Admin. Code § 30-10-10; *Beverly Health and Rehabilitation Services, Inc. v. Metcalf*, 24 Va. App. 584, 587 (1997). Virginia provides Medicaid to its citizens, and others as determined by statute, in order for the needy, or those otherwise qualified, to receive medical assistance. 12 Va. Admin. Code §§ 30-40-10 through 30-50-95. DMAS reimburses providers for qualifying services performed pursuant to Medicaid regulations. *See, e.g.*, *Dep't of Medical Assistance Services v. Beverly Healthcare of Fredericksburg*, 41 Va. App. 468, 480-83 (2003) (reviewing the DMAS decision that nursing home facilities were not entitled to Medicaid reimbursement payments); 12 Va. Admin. Code § 30-50-95 (discussing reimbursement policies generally).

[3] The record indicates there were medical expenses paid by the couple; the Commonwealth did not pursue them at the restitution hearing. The impact statement recounts: "It was financially hard because we had to keep buying bandages, gauze and wrap, and medication until the Emergency Medicaid kicked in."

§ 19.2-305.1(B) applied, requiring appellant to "make at least partial restitution . . . for any medical expenses." The trial court stated it was "required" to issue restitution under this statute—thus, it did not purport to award discretionary restitution under Code § 19.2-305 to an "aggrieved party."

The trial court, in passing sentence, noted that Puckett had a varied and extensive "criminal history, and it spans for decades." The sentencing judge concluded: "I think you are incorrigible." The court further observed that the attack on Hawks "was an extremely serious crime of violence, and we are fortunate that Mr. Hawks is still alive." The trial court ordered appellant to pay the full amount of restitution requested by the Commonwealth. Puckett's counsel indicated that the issue of restitution was largely semantic, given Puckett's lack of resources. There was no other evidence on the record as to Puckett's ability to pay $22,691.01, and there was evidence that he was indigent and essentially homeless. The court ultimately ordered Puckett to pay off the restitution award to DMAS at $50 per month upon his release.

This appeal follows.

## Analysis

### I. Sufficiency of the Evidence

Appellant's first assignment of error alleges that "[t]he trial court erred in finding [appellant] guilty of malicious wounding because the evidence established that the incident arose out of mutual combat and that [appellant] was legally defending himself, or alternatively, acted without malice."

When reviewing the sufficiency of the evidence, the evidence must be considered in the light most favorable to the Commonwealth, and the judgment of the trial court may be reversed only when its decision "is plainly wrong or without evidence to support it." *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327

(2018)).  "[T]he relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).

Appellant was found guilty of malicious wounding under Code § 18.2-51, which reads:

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony.  If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

Thus, in order to sustain a conviction under Code § 18.2-51, "the Commonwealth must prove that the defendant maliciously stabbed, cut, or wounded 'any person or by any means cause[d] him bodily injury, with the intent to maim, disfigure, disable, or kill.'"  *Perkins*, 295 Va. at 328 (emphasis omitted) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)).  The requisite intent under Code § 18.2-51 requires the Commonwealth to prove that the defendant "intend[ed] to permanently, not merely temporarily, harm another person."  *Id.* at 330 (quoting *Burkeen*, 286 Va. at 259).

### A.  There was Evidence of Malice and Intent to Maim

"Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.  It may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury."  *Davis v. Commonwealth*, 65 Va. App. 485, 502 (2015) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)).  "The presence of malice 'is a question of fact to be determined by [the trier of fact].'"  *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) (quoting *Long v. Commonwealth*, 8 Va. App. 194, 198 (1989)).

"Malice may be inferred from the 'deliberate use of a deadly weapon unless, from all the evidence, [there is] reasonable doubt as to whether malice existed.'"  *Id.* (quoting *Strickler v.*

*Commonwealth*, 241 Va. 482, 495 (1991)). A deadly weapon is "one which is likely to produce death or great bodily injury from the manner in which it is used." *Id.* (quoting *Pannill v. Commonwealth*, 185 Va. 244, 254 (1946)).

"It is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions." *Ellis v. Commonwealth*, 281 Va. 499, 507 (2011). Furthermore, "[i]t is proper for a court to consider not only the method by which a victim is wounded, but also the circumstances under which that injury was inflicted in determining whether there is sufficient evidence to prove an intent to maim, disfigure, disable or kill." *Burkeen*, 286 Va. at 260-61.

Puckett argues that the evidence "clearly shows an absence of intent to maim, disable, disfigure or kill, and certainly an absence of malice." Puckett's interpretation of the record rings hollow. Appellant used a knife to stab Hawks in the chest multiple times. The evidence, when viewed in best light to the Commonwealth, established that Hawks was walking away from Puckett when appellant jumped onto his back, declared that he was "killing" Hawks, and then stabbed him in the chest and arm. Even after Hawks ran for help, he heard Puckett screaming, "You're a dead motherfucker. I killed you." Appellant's words, acts, and conduct provided sufficient evidence for the trial court to properly find that appellant acted with malice when he wounded Hawks, and that he did so with the intent to maim, disfigure, disable, or kill him.

B. <u>The Record Supports the Fact-Finder's Rejection of Puckett's Self-Defense and Mutual Combat Claim</u>

Puckett next argues that, in light of his own description of events, he "had no option but to stab" Hawks in self-defense. He also asserts, in the alternative, that "this case clearly was one of mutual combat" and that the trial court should have—at worst—found him guilty of the lesser charge of unlawful wounding.

Puckett's arguments, however, fail to give proper force to the applicable standard of review. On appeal, this Court must "discard any of appellant's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *Gerald*, 295 Va. at 473. Viewing the evidence in this light, the Commonwealth established that appellant was acting erratically and making violent threats on the day in question, that he repeatedly refused to leave Hawks' home, and that he eventually attacked Hawks from behind and stabbed him multiple times.

The trial court found that Hawks was unarmed and had only "a fairly small" flashlight. The court further found that appellant did *not* act in self-defense, stating: "I think [appellant] was angry at the world, and perhaps, at Mr. Hawks for putting him out of his residence." In making this finding, the court noted that Hawks' wounds "were made towards his lungs and heart" and that Hawks suffered "a series of blows," rather than "just one or two to get someone off of you."[4]

"The credibility of the witnesses and the weight accorded the evidence are matters *solely for the fact finder* who has the opportunity to see and hear that evidence as it is presented." *Perkins*, 295 Va. at 328 (emphasis added) (quoting *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009)). Here, the trial court's findings were not plainly wrong or without evidence to support them. We will not disturb these findings on appeal. They are sufficient to support the conviction.

---

[4] The "mutual combat" defense was not raised below, but would meet the same fate as the self-defense claim, if preserved. The finder-of-fact wholly rejected Puckett's version of the incident and accepted Hawks' account. When the evidence is viewed in best light to the Commonwealth, Hawks told Puckett he would not fight him just moments before appellant knifed him repeatedly.

## II. Victim Impact Statement

Puckett also assigns error to the trial court's decision to admit "a victim impact statement written by a person other than the victim because this person was not authorized to submit a victim impact statement under the applicable statute." Appellant argues that the trial court wrongly permitted Hawks' live-in girlfriend to submit a victim impact statement. Puckett asserts that a live-in girlfriend does not meet the definition of a "victim" under Code § 19.2-11.01 and that as a girlfriend, but *not* a "spouse," she "was statutorily ineligible to prepare such a statement with reference to her own aggrievement."

To the extent that this assignment of error requires statutory interpretation, it is subject to a *de novo* standard of review. *Ragland v. Commonwealth*, 67 Va. App. 519, 530 (2017). However, "[d]ecisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).

Code § 19.2-299.1 states in pertinent part:

> The presentence report prepared pursuant to § 19.2-299 shall, with the consent of the victim, as defined in § 19.2-11.01, in all cases, include a Victim Impact Statement.
>
> . . . If prepared by someone other than the victim, it shall (i) identify the victim, (ii) itemize any economic loss suffered by the victim as a result of the offense, (iii) identify the nature and extent of any physical or psychological injury suffered by the victim as a result of the offense, (iv) detail any change in the victim's personal welfare, lifestyle or familial relationships as a result of the offense, (v) identify any request for psychological or medical services initiated by the victim or the victim's family as a result of the offense, and (vi) provide such other information as the court may require related to the impact of the offense upon the victim.
>
> . . . .

The Victim Impact Statement may be considered by the court in determining the appropriate sentence.

The statute clearly contemplates a statement "prepared by someone other than the victim."

Code § 19.2-11.01[5] defines a victim as "(i) a person who has suffered physical, psychological, or economic harm as a direct result of the commission of (a) a felony . . . ; (ii) a spouse or child of such a person."

In *Beck v. Commonwealth*, 253 Va. 373, 382 (1997), the Supreme Court of Virginia determined that the Crime Victim and Witness Rights Act ("the Act"), Code §§ 19.2-11.01 to -11.4, did not bar victim impact evidence from persons other than the victim's family members in a capital murder case. The defendant in *Beck* argued that the definition of "victim" in Code § 19.2-11.01 showed an implicit intent by the legislature to allow victim impact evidence only from people meeting that definition. *Id.* at 384. The Supreme Court flatly disagreed, finding that

> [w]hile the Act provides for the right of victims, as defined therein, to prepare a written impact statement, nothing within the Act limits the nature of victim impact evidence to such statements alone. Similarly, the reference to the Act in Code § 19.2-299.1 merely defines the person or persons whose consent the Commonwealth must obtain in order to include the victim impact statement in the sentencing report.

*Id.*

The *Beck* Court concluded that

> [n]othing in Code § 19.2-299.1 expressly or implicitly limits the sources on which the Commonwealth may draw in its preparation of the victim impact portion of the presentence report. Rather, the report is to contain whatever information the trial court "may require related to the impact of the offense upon the victim." . . . [T]he circumstances of the individual case will dictate what

---

[5] Code § 19.2-11.01 explains this definition is for the purposes of the Crime Victim and Witness Rights Act, Chapter 1.1. It applies to Code § 19.2-299.1 only through explicit incorporation.

- 11 -

evidence will be necessary and relevant, and from what sources it
may be drawn.

*Id.* (quoting Code § 19.2-299.1).

The admissibility of victim impact testimony by someone who is not a "victim" under

Code § 19.2-11.01 lies "within the sound discretion of the trial court" and is governed by an

abuse of discretion standard of review:

> We hold that the statutes do not limit evidence of victim impact to
> that received from the victim's family members. Rather, the
> circumstances of the individual case will dictate what evidence
> will be necessary and relevant, and from what sources it may be
> drawn. In a capital murder trial, as in any other criminal
> proceeding, the determination of the admissibility of relevant
> evidence is within the sound discretion of the trial court subject to
> the test of abuse of that discretion.

*Beck*, 253 Va. at 384-85; *see also Rock v. Commonwealth*, 45 Va. App. 254, 261 (2005).

Under *Beck*, the trial court should analyze "the circumstances of the individual case" to

determine whether such evidence is "necessary and relevant." *Beck*, 253 Va. at 384; *see Rock*,

45 Va. App. at 262. The fact that Hawks' live-in girlfriend is not his "spouse" under Code

§ 19.2-11.01 does not prevent her from providing victim input. *See Rock*, 45 Va. App. at 261.

Appellant also argues that Sawyers' statement impermissibly referred to the impact of the

crime on herself and her child, rather than exclusively on Hawks himself. Approximately half of

the contested six-sentence statement describes the effects of the assault on Sawyers and her

daughter. The rest of the statement describes the attack's financial and physical aftermath, as

well as its effect on Hawks' relationship with Sawyers. Notably, Hawks' own victim impact

statement—the admissibility of which was not contested in the lower court or on appeal—

discusses much of the same content as the contested statement, including the physical and

emotional effects of the assault on Hawks, as well as the strain it placed on his relationship with

Sawyers. Indeed, he lamented the emotional toll his injuries placed on his live-in girlfriend and

- 12 -

her daughter and the strain it placed on his relationship with them. In essence, the hardships faced by the people caring for him imposed a significant burden on Hawks himself.

"In reviewing an exercise of discretion, we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Beck*, 253 Va. at 385. Our review of the record "reveals no statement concerning the impact of the crimes so inherently prejudicial that its admission would constitute an abuse of discretion." *Id.* at 386. Testimony at trial established that Sawyers and Hawks were in an intimate relationship, lived together, and were raising Sawyers' child. The information in Sawyers' victim impact statement pertained to "the nature and extent of any physical or psychological injury suffered by the victim as a result of the offense," and to "change[s] in the victim's personal welfare, lifestyle or familial relationships as a result of the offense." *See* Code § 19.2-299.1. Admitting the statement substantially complied with the statute.[6]

### III. The Trial Court Erroneously Awarded Restitution to DMAS

Puckett assigns error to the trial court's restitution award to DMAS. We consider whether DMAS can be a "victim" for purposes of recovering restitution under Code § 19.2-305.1(B) arising from the malicious wounding of Hawks, the direct victim of the attack.

---

[6] "Our jurisprudence requires us to seek 'the best and narrowest ground available' for our decision." *Abdo v. Commonwealth*, 64 Va. App. 468, 473 n.1 (2015) (quoting *Armstead v. Commonwealth*, 56 Va. App. 569, 576 (2010)). Here, the trial court found that Sawyers was "someone who was dealing with the victim and certainly . . . suffered some kind of psychological harm as a result of [appellant's] actions." Because we find that the trial court did not abuse its discretion in admitting the victim impact statement into evidence, it is unnecessary for this Court to reach the question of whether Hawks' girlfriend met the definition of a "victim" under Code § 19.2-11.01 ("a person who has suffered . . . psychological . . . harm as a direct result of the commission of . . . a felony"). To the extent that the contested victim impact statement contained tangential information regarding the effect of the assault on Sawyers and her daughter—extending beyond its effect on Hawks or on their relationship—the Commonwealth argues that the trial court did not appear to rely on Sawyers' statement and that any such error was harmless under Code § 8.01-678 ("When it plainly appears from the record . . . that . . . substantial justice has been reached, no judgment shall be arrested or reversed[.]"). We agree.

The Commonwealth sought no restitution for Hawks in the sentencing order, and he was awarded none.

We review a trial court's restitution determination for abuse of discretion. *Fleisher v. Commonwealth*, 69 Va. App. 685, 689 (2019). The determination of the appropriate amount of restitution calls for the exercise of "sound judicial discretion." *Ohree v. Commonwealth*, 26 Va. App. 299, 311 (1998); *Slusser v. Commonwealth*, 74 Va. App. 761, 773 (2022). "It is immaterial that other judges 'might have reached a different conclusion than the one under review.'" *Fleisher*, 69 Va. App. at 689 (quoting *Du v. Commonwealth*, 292 Va. 555, 564 (2016)). A trial court "by definition abuses its discretion when it makes an error of law." *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)); *see also Murray v. Commonwealth*, 71 Va. App. 449, 456 (2020). Moreover, a trial court's interpretation of a statute is a legal question which is reviewed under a *de novo* standard. *Addison v. Jurgelsky*, 281 Va. 205, 208 (2011).

A. <u>Virginia Sentencing Laws Provide Trial Judges with the Tool of Restitution to Aid in Rehabilitating Criminals</u>

"The statutory scheme for ordering restitution was established by the Virginia legislature as a conjunct of suspended sentences." *McCullough v. Commonwealth*, 38 Va. App. 811, 815 (2002). As this Court explained in *McCullough*:

> Although historically denominated a criminal penalty, restitution under Virginia law may be more accurately characterized as quasi-civil in nature . . . . Part of the sentencing phase of trial, the amount is determined following conviction and is a matter resting within the sole province of the sentencing judge.

*Id.* (citing *Frazier v. Commonwealth*, 20 Va. App. 719, 721-22 (1995)). Our decisions show that restitution can serve various purposes—and sometimes competing ones. Restitution is intended as a remedial tool to help rehabilitate criminals, *Deal v. Commonwealth*, 15 Va. App. 157, 160 (1992), and to help "make the victim of a crime whole," *McCullough*, 38 Va. App. at 815; *see*

- 14 -

*also Slusser*, 74 Va. App. at 770. It can also serve to ensure that a criminal does not profit from his misdeeds. *Waiters v. Commonwealth*, 33 Va. App. 739, 742-43 (2000). As *McCullough* points out, restitution may also fulfill additional purposes, including deterrence and retribution. *See Note, Victim Restitution in the Criminal Process: A Procedural Analysis*, 97 Harv. L. Rev. 931, 937-41 (1984); *McCullough*, 38 Va. App. at 815 n.1.[7] Restitution ultimately serves rehabilitative and deterrent goals by encouraging a defendant to recognize the relationship between his criminal activity and the damage suffered by the victim. Kimberly J. Winbush, Annotation, *Persons or Entities Entitled to Restitution as "Victim" Under State Criminal Restitution Statute*, 92 A.L.R. 5th 35 § 2(a) (2001).

Suspended sentences employing conditions such as restitution provide an "alternative to incarceration." *Garibaldi v. Commonwealth*, 71 Va. App. 64, 69 (2019). When a trial judge suspends a sentence, however, she "does not make a contract with the accused, but only extends to him the opportunity which the state affords him to repent and reform." *Richardson v. Commonwealth*, 131 Va. 802, 810 (1921). As a rehabilitative device, Virginia's sentencing statutes are considered "highly remedial and should be liberally construed to provide trial courts valuable tools for rehabilitation of criminals." *Peyton v. Commonwealth*, 268 Va. 503, 508 (2004). Nonetheless, the scheme is statutory, and our courts do not have discretion to contravene

---

[7] This same law review notes that:

> [i]n ancient societies, before the conceptual separation of civil and criminal law, it was standard practice to require an offender to reimburse the victim or his family for any loss caused by the offense. The primary purpose of such restitution was not to compensate the victim, but to protect the offender from violent retaliation by the victim or the community. It was a means by which the offender could buy back the peace he had broken.

97 Harv. L. Rev. at 933-34 (citations omitted).

statutory dictates. "In determining whether the trial court made an error of law, 'we review the trial court's statutory interpretations and legal conclusions *de novo*.'" *Rollins v. Commonwealth*, 37 Va. App. 73, 79 (2001) (quoting *Timbers v. Commonwealth*, 28 Va. App. 187, 193 (1998)).

B. The Statutory Scheme Provides for Restitution for Medical Expenses "incurred by the victim . . . as a result of the crime."

### Interpreting the Statutory Scheme

In interpreting the governing statutes, we must glean the General Assembly's "intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result." *Pelloni v. Commonwealth*, 65 Va. App. 733, 739 (2016) (quoting *Schwartz v. Commonwealth*, 45 Va. App. 407, 450 (2005)). "[W]e examine a statute in its entirety, rather than by isolating particular words or phrases. When the language in a statute is clear and unambiguous, we are bound by the plain meaning of that language." *Schwartz*, 45 Va. App. at 450 (quoting *Cummings v. Fulghum*, 261 Va. 73, 77 (2001)). "When interpreting and applying a statute, [courts] assume that the General Assembly chose, with care, the words it used in enacting the statute." *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 75 (2016) (quoting *Kiser v. A.W. Chesterton Co.*, 285 Va. 12, 19 n.2 (2013)). Therefore, we must read the statute "so as to give reasonable effect to every word." *Id.* (quoting *Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 483 (2008)).

The central focus of this issue lies with Code §§ 19.2-303, 19.2-305, and 19.2-305.1(B).[8] Code § 19.2-305 states:

_____

[8] In pertinent part, Code § 19.2-303 states:

> After conviction, whether with or without jury, the court may suspend imposition of sentence or suspend the sentence in whole or part and in addition may place the defendant on probation under such conditions as the court shall determine, including monitoring by a GPS (Global Positioning System) tracking device, or other similar device, or may, as a condition of a suspended sentence,

B. A defendant placed on probation following conviction may be required to make at least partial restitution or reparation to the *aggrieved party or parties for damages or loss caused by the offense* for which conviction was had, or may be required to provide for this support of his spouse or others for whose support he may be legally responsible, or may be required to perform community services. The defendant may submit a proposal to the court for making restitution, for providing for support, or for performing community services.

(Emphasis added). These requirements dealing with certain restitution awards are then amplified

by Code § 19.2-305.1(B) which more specifically breaks down restitution awards based on the

nature of the loss and to whom the award is made:

Notwithstanding any other provision of law, any person who, on or after July 1, 1995, commits, and is convicted of, a crime in violation of any provision in Title 18.2 *shall* make at least partial restitution for any property damage or loss caused by the crime or *for any medical expenses or expenses directly related to funeral or burial incurred by the victim or his estate as a result of the crime*, may be compelled to perform community services and, if the court so orders, shall submit a plan for doing that which appears to be feasible to the court under the circumstances.

(Emphasis added, except "shall" emphasized in original).

The Commonwealth argued below that DMAS "provided the payment for the physical

victim's medical treatment" and "paying out twenty-two thousand dollars from the agency's

funds . . . would constitute economic harm, and therefore, they could be rightfully considered a

victim and entitled to restitution." The Commonwealth also candidly acknowledged that it could

locate no Virginia cases implementing this actual outcome that an "insurer" of a victim's medical

require the defendant to make at least partial restitution to the aggrieved party or parties for damages or loss caused by the offense for which convicted, or to perform community service, or both, under terms and conditions which shall be entered in writing by the court.

expenses for physical injury was also a "victim" of the underlying crime under Code

§ 19.2-305.1(B).[9]

### C.  The Restitution Ruling Below

The trial court found that Code § 19.2-305.1(B) controls here:

> I determine that § 19.2-305.1.B applies, which requires that convicted defendant "make at least partial restitution . . . for any medical expenses" as a condition of probation or suspended sentence.

The trial court, however, failed to consider the term "any medical expenses" in the context of its statutory modifier "incurred by the victim or his estate as a result of the crime."  The restitution order listed only DMAS as the "victim" and awarded no restitution at all to Hawks.  The court also indicated that it was "required" to award restitution by the "shall" language in Code § 19.2-305.1(B).  The trial court's award was not a discretionary award to an aggrieved party under Code § 19.2-305.

For the following reasons, we conclude that DMAS is not a "victim" in this case under Virginia's existing statutory framework and that it was not established that these medical expenses were "incurred by the victim" of Puckett's malicious wounding.[10]  As a result, the trial court erred in concluding that it was required to make a restitution award to DMAS.

---

[9] The Commonwealth asserts that our decision in *Alger v. Commonwealth*, 19 Va. App. 252 (1994), controls the outcome here.  Although *Alger* did address a predecessor version of Code § 19.2-305.1(B), the language of the statute has been significantly changed.  In *Alger*, the statute did not require a restitution award "for any medical expenses or expenses directly related to funeral or burial incurred by the victim or his estate as a result of the crime[.]"  It is this specific language that controls the outcome here.

[10] Neither party briefed or argued whether a victim "incurs" a charge if insurance pays for the expense.  To "incur" means "[t]o suffer or bring on oneself (a liability or expense)."  *Incur*, *Black's Law Dictionary* (10th ed. 2014).  The Supreme Court of Virginia has defined "incurred" in regard to automobile insurance policies covering medical expenses, stating:  "An expense can only be 'incurred' when one has paid it or become legally obligated to pay it."  *Va. Farm Bureau Mut. Ins. Co. v. Hodges*, 238 Va. 692, 696 (1989); *State Farm Mut. Ins. Co. v. Bowers*, 255 Va. 581, 585 (1998); *see also* Code § 38.2-2201(A)(3).  This, of course, is not an auto insurance

D. Who is the "Victim" of Puckett's Act of Malicious Wounding—and Who Incurred the Medical Expenses?

Puckett acknowledges that DMAS can be a "victim" under the restitution statutes when it is a *direct* victim of fraud or embezzlement. *See, e.g.*, *Burriesci v. Commonwealth*, 59 Va. App. 50 (2011) (DMAS suffered losses as a direct and intended result of appellant's fraud against DMAS); *see also State v. Stewart*, 778 N.W.2d 62, 64 (Iowa 2008) (finding governmental agency can be a victim where it suffered a direct loss from the crime). Thus, for purposes of property damages or loss an insurer can be an "aggrieved party"—or it can be an actual "victim" in the context of having directly suffered fraud or embezzlement. *See Burriesci*, 59 Va. App. at 61. But this is not an embezzlement or fraud setting. In the present case, Puckett assaulted a person whose medical expenses were paid by the Medicaid program administered by DMAS. The direct victim of the crime was Hawks, the person assaulted by Puckett. DMAS and the Medicaid program were not the victims of Puckett's malicious wounding.

Several factors compel this outcome. First, the nature of the malicious wounding statute underlying this case requires a human victim:

---

case. For Medicaid eligibility calculations, Medicaid looks at whether income over the eligibility limit can be subtracted from the individual's income because it is an incurred medical expense. 12 Va. Admin. Code § 30-110-1030. For this purpose, "incurred expenses" is defined as "medical or remedial services" which:

1) Are recognized under state law;
2) Are rendered to an individual, family, or financially responsible relative;
3) The individual is liable for in the applicable pay period; and
4) *Are not subject to payment by any liable third party*.

12 Va. Admin. Code § 30-110-1020 (emphasis added.)

Under this logic, Hawks did not incur any medical expenses other than what he paid out of pocket. A Virginia Medicaid recipient cannot be charged any copay, deductible, or fee for emergency services. 12 Va. Admin. Code § 30-10-570. Here, we know Hawks received extensive emergency care for his wounds. However, the Commonwealth made no evidentiary showing below that the victim was charged for or liable for his medical expenses.

- 19 -

§ 18.2-51. Shooting, stabbing, etc., with intent to maim, kill, etc.

> If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony. If such act be done unlawfully but not maliciously, with the intent aforesaid, the offender shall be guilty of a Class 6 felony.

The criminal complaint and indictment in this case listed a specific "victim"—Justin Hawks. *See Perkins*, 295 Va. at 328 (noting that Code § 18.2-51 requires a showing that the defendant wounded a person and that he intended to permanently harm that person). The language of Code § 19.2-305.1(B) limits recovery to "the victim or his estate."[11]

In *Epps v. Commonwealth*, 47 Va. App. 687 (2006), this Court examined whether an offended judge or the court itself was the "victim" of contempt of court. We first examined the definition of the offense: "Contempt is defined as an act in disrespect of the court or its processes, or which obstructs the administration of justice, or tends to bring the court into disrepute." *Epps*, 47 Va. App. at 708 (citations omitted). The Court then concluded that the object of the offense is the court, not the judge who witnesses the insulting conduct: "Any damages resulting from [the sheriff's] conduct were suffered by the court, not by [the judge] individually. Contempt offends the dignity of the court, not the dignity of the judge." *Id.* Just as the victim and object of contempt of court is the court, the victim and object of a malicious wounding is the injured person.

The Commonwealth argued below, in essence, that any party suffering an economic loss is a victim for purposes of Code § 19.2-305.1(B). This ignored, however, that it was trying to

---

[11] Only a human victim would have an estate—and only a human victim (as opposed to a corporation) could have a burial, funeral, or medical expense. As noted above, the statute specifically sets out "the victim," "his estate," or the Criminal Injuries Compensation Fund as the possible recipients of medical expenses. Code § 19.2-305.1(B) and 19.2-305.1(I). The scheme also permits the defendant to submit a proposal for "making restitution" where a defendant seeks to "buy peace." *See Shelton v. Commonwealth*, 66 Va. App. 1, 8 n.1 (2016).

recover "medical expenses" and that the General Assembly has specifically narrowed who could recover such losses under Code § 19.2-305.1(B). "Victims" and "aggrieved parties" are not synonymous—we assume the legislature chooses its language with care. *See Williams v. Commonwealth*, 61 Va. App. 1, 7 (2012) (citing *Coles v. Commonwealth*, 44 Va. App. 549, 557-58 (2004)). When it uses two different words or phrases in the same statutory setting, we must conclude the words have different meanings. *Brown v. Commonwealth*, 284 Va. 538, 545 (2012); *see Bonanno v. Quinn*, 299 Va. 722, 730 (2021) ("the General Assembly knows the difference between persons and parties").

In this setting, Code §§ 19.2-303 and 19.2-305 allow restitution to an "aggrieved party," which can include an individual who is not necessarily the direct subject of the crime. However, with respect to medical expenses, the victim who has incurred these expenses is the proper recipient of the award pursuant to Code § 19.2-305.1(B).

Numerous cases from other jurisdictions conclude that an insurer or Medicaid provider is not a direct, or literal, "victim" of a crime for purposes of recovering restitution for medical expenses. *See, e.g.*, *State v. Stewart*, 778 N.W.2d 62 (Iowa Ct. App. 2009) (Medicaid program was not a victim eligible to receive restitution payments); *State v. Alford*, 970 S.W.2d 944 (Tenn. 1998) (a defendant convicted of aggravated assault could not be ordered to pay restitution to the victim's insurer because "victim" refers only to the individual or individuals against whom the assault was actually committed and a victim's insurer did not fall within the natural and ordinary meaning of the term "victim"); *State v. Galigo*, 551 N.W.2d 303 (S.D. 1996) (reversing restitution order imposed against defendant who stabbed victims where offender could not be ordered to pay state agency that paid victim's medical expenses rather than the actual victims— noting statute was subsequently changed to specifically include insurers but would not be applied retroactively); *People v. McCarthy*, 292 P.3d 1090 (Colo. App. 2012) (state agency paying

Medicaid was not an enumerated victim in statute and the vehicular assault statute defined victim as a human being suffering serious bodily injury). These cases also note that an insurer does not suffer an unexpected hardship or loss by virtue of a victim's wounds; rather, it pays his medical expenses based on a contractual or (in DMAS' situation) statutory obligation. *See Alford*, 970 S.W.2d at 946 (noting that an insurer pays on a contractual obligation and does not suffer the unexpected harm that an actual victim suffers); *Martinez v. State*, 974 P.2d 133, 134-35 (Nev. 1999) (same). Without this intervening contractual or statutory obligation to pay, a malicious wounding would not impact an insurer as a victim.

Notably, in the trial court, the Commonwealth focused on the definition of "victim" in Code § 19.2-11.01 (victim impact statements), suggesting it governs the restitution award. This definition, however, expressly relates to victim impact statements. The definition in Code § 19.2-11.01 is limited to "this chapter" (the Crime Victim and Witness Rights Act), and it defines a victim under this provision as "a person who has suffered, physical, psychological, or economic harm as a *direct* result of the commission of . . . a felony." (Emphasis added). Code § 19.2-11.01 is intended to permit victims of crime to provide information to the sentencing court. At oral argument, the distinction between this purpose and the restitution statutes was apparent. The hypothetical was posed that if a father of several children is murdered, each child might properly qualify as one who suffered "psychological harm" as a direct result of the crime for purposes of providing an impact statement; the Commonwealth acknowledged, however, that each child could not be entitled to restitution from the defendant. Thus, even this definition of victim relied on by the Commonwealth requires a *direct* link between the criminal act and the injury. That link is not present here with respect to DMAS and Puckett's stabbing of Hawks.[12]

_____

[12] Finally, we are also mindful that the Commonwealth could offer no cases where its interpretation of the restitution statutes was permitted in a "medical expense" context. We note several unpublished cases, lacking precedential value under Code § 17.1-413, deal with

The restitution order below did not award the actual victim of Puckett's malicious wounding any restitution. The restitution order, instead, listed DMAS as the victim. The trial court stated that it was required to make an award, showing it was not granting discretionary restitution under Code § 19.2-305 (to an aggrieved party). Our holding in this setting is narrow. As written, Code § 19.2-305.1(B) does not authorize payments to DMAS for medical expenses as a victim under the circumstances present. Accordingly, we reverse the restitution order entered by the trial court.

### E. On Remand

We remand to the trial court for the limited purposes of determining whether, consistent with Code § 19.2-305.1(B), the evidence supports an award of restitution to Hawks for any "medical expenses . . . incurred by the victim . . . as a result of the crime." On remand the trial court may also consider, in its discretion, whether to award restitution to an aggrieved party under Code § 19.2-305.

In closing, we note that when determining restitution, a court may weigh competing goals of deterrence, rehabilitation, and desires to make the victim whole. Our case law indicates that consistent with these considerations, a court is well-advised to consider an offender's ability to pay. *Deal*, 15 Va. App. at 160-61 (finding that "conditions upon the suspension of execution or imposition of a sentence must be reasonable in relation to the nature of the offense, *the background of the offender* and the surrounding circumstances" (emphasis added)); *Slusser*, 74 Va. App. at 771 ("In awarding less-than-full restitution, the trial court may properly consider 'the

---

restitution to victims after insurance payments to the victim. *See Keith v. Commonwealth*, No. 0694-17-3 (Va. Ct. App. May 8, 2018) (permitting funeral expenses to victim's mother); *Deidrich v. Commonwealth*, No. 0962-98-1 (Va. Ct. App. June 29, 1999) (remanding restitution award to consider circumstances of third-party payment). The collateral source rule at issue in *Keith* was not raised by either party on this appeal, and Virginia has not decided whether the collateral source rule applies in the criminal restitution context. *Slusser*, 74 Va. App. at 779-80.

defendant's ability to pay.'" (quoting *Ohree*, 26 Va. App. at 311)).  As this Court recently

explained:

> A trial court may properly determine that the goal of rehabilitation
> would be disserved by imposing a restitution award so large that
> the defendant could never repay it.  *See, e.g.*, *Rapozo v. State*, 497
> P.3d 81, 96 (Haw. 2021) ("[A] restitution order patently beyond an
> offender's capacity for compliance serves no purpose, reparative or
> otherwise."); *People v. Kay*, 111 Cal. Rptr. 894, 896 (Cal. Ct. App.
> 1973) ("[T]o subject a defendant to a judgment which he cannot
> pay and has no reasonable prospect of paying . . . is of little use to
> the victim of the crime, and is apt to be either frustrating to a
> repentant probationer or perversely satisfying to a rebellious
> one.").

*Tyler v. Commonwealth*, ____ Va. App. ____, ____ (July 26, 2022) (Raphael, J., concurring).

Puckett's intentional conduct caused serious injury to Hawks, and the trial court has

broad discretion in setting a proper amount of restitution.  Nonetheless, Puckett's ability to pay

would be a proper consideration on remand.[13]

### Conclusion

The trial court did not err in accepting Hawks' version of the events underlying the

stabbing despite appellant's testimony to the contrary.  Hawks testified that he was attacked from

behind as he was walking away from appellant, and Hawks' medical records confirm that he was

stabbed multiple times and suffered serious injury as a result.  Puckett's threats, statements, and

actions during and after the attack supported a finding of malice and intent to maim.  The

evidence was sufficient to support Puckett's conviction for malicious wounding.

---

[13] Puckett was over sixty years old at sentencing and was sentenced to incarceration for
twenty years (with eight years suspended).  He was ordered to pay the amount of $22,691.01 in
$50 increments each month beginning forty-five days after his release from incarceration.  The
only reference to his ability to pay the award is Puckett's counsel's statement that ordering
restitution would be "an exercise in futility."  His last request for legal assistance showed no
assets and listed his address as "homeless."

The trial court did not abuse its discretion in admitting Hawks' girlfriend's victim impact statement into evidence. Much of the contested statement describes the attack's effects on Hawks and on his relationship with his girlfriend, and Hawks' own victim impact statement offers similar information. The content of the statement was relevant to the impact of the offense upon Hawks, and it was not inherently prejudicial to appellant.

As to the ordering of restitution, we reverse and remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed and remanded in part.*