COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Athey and Fulton
Argued by videoconference

RICARDO MANZELL HOPE

MEMORANDUM OPINION* BY
v.      Record No. 1401-23-3                    JUDGE JUNIUS P. FULTON, III
                                                OCTOBER 22, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

Heath L. Sabin (Sabin Law Office, PC, on brief), for appellant.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Ricardo Manzell Hope appeals his convictions, following a jury trial, for conspiracy to

distribute a Schedule III controlled substance, conspiracy to distribute a Schedule III controlled

substance to an inmate, and attempting to possess a Schedule III controlled substance with an

intent to distribute, in violation of Code §§ 18.2-248(E)(1), -256, -257(a), and -474.1. On

appeal, Hope argues that the trial court erred when it denied his motion to continue; when it

refused to grant his proposed jury instructions; and when it admitted the packaged evidence and

the certificate of analysis. Hope also asserts that the evidence was insufficient to support his

convictions. For the following reasons, we disagree, and affirm the convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

## I. Pre-Trial Proceedings

By order entered on November 5, 2021, the trial court granted Hope's motion to continue his bench trial from October 12, 2021, until January 25, 2022. On January 25, 2022, the trial court, sua sponte, continued the matter until February 18, 2022, due to the COVID-19 pandemic. By order on March 1, 2022, the trial court granted the Commonwealth's motion to continue the matter from February 18, 2022, to April 22, 2022. On April 22, 2022, Hope appeared before the trial court and asserted his right to be tried by a jury. The trial court continued the matter. On May 17, 2022, the matter was set for a jury trial on September 19, 2022. On September 12, 2022, the trial court granted Hope's second motion to continue the matter from September 19, 2022, until February 13, 2023.

On the morning of February 13, 2023, Hope moved, for a third time, to continue his trial. Hope asserted that he was not ready for trial, that he had not communicated with his attorney until several days before, and that he had questions regarding certain evidence to be presented. Hope also asserted that he wanted his attorney to locate videos of his recorded jail calls. Hope's trial counsel noted that after investigation he had determined that the videos did not exist.

The trial court denied Hope's motion to continue the matter. The court noted that the matter had been pending for some time and that it had been continued twice on Hope's motion. Further, the court found that Hope's trial counsel had investigated Hope's concerns and was prepared for trial.

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

## II.  Evidence at Trial

On April 21, 2020, Lucinda Gibbs, a mail room employee at Green Rock Correctional Center in Pittsylvania County, collected mail from the Chatham post office.  Upon returning to Green Rock, Gibbs lined up several unopened packages for Correction Officer Preston Henderson and his canine to inspect.  The dog, which was trained to detect narcotics, alerted to a package addressed to "Mr. Ricardo M. Hope #1194776."  Officer Henderson secured the package and continued to walk his canine along the hallway; the dog did not alert to any other package.

Officer Henderson informed Pittsylvania County Deputy Sheriff A.J. Hamlett that a package may contain narcotics.[2]  Officer Henderson could not remember who opened the suspicious package but confirmed that he took "step by step" pictures to "document what was found."  Inside the package officers found an encyclopedia.  In the encyclopedia's spine were ten square packets wrapped in cellophane taped to the cardboard spine.  The packets were composed of individually wrapped strips of an orange substance.  Deputy Hamlett sealed the strips in an evidence bag with red tape, filled out a forensic lab request, and placed the sealed contraband in an evidence locker.  Only Deputy Hamlett and another intelligence officer had access to the evidence locker.  Sometime later, Deputy Hamlett transferred the contraband to the lab for testing.

At trial, Hamlett noted his initials were on the evidence bag and that the red tape he put across the top of the evidence bag was still intact.  When shown the package and the orange

---

[2] Deputy Hamlett noted that at the time of the incident he was working as an intelligence officer at the Green Rock Correctional Center.  As such, Deputy Hamlett asserted that he was *not* a law enforcement officer and did not have the authority to arrest anyone.  In his work at the prison, Deputy Hamlett gave the information he gathered to a law enforcement agency.

strips at trial, Officer Henderson recognized the package was the same package that his dog had alerted to and that the orange strips were the same as those found in the book.

Forensic toxicologist Ashton Lesiak testified that she recognized the orange strips as the items she had tested. She noted that her initials were on the evidence bag and that the yellow tape that she had applied at the bottom of the bag after completing her testing was still intact. When shown the certificate of analysis, Lesiak noted that her name and signature were on the report and that "the laboratory number on the certificate correspond[ed] to the laboratory number on the evidence."

Lesiak explained that when she tests evidence, she works on one case at a time, and she begins with a visual inspection. In this case, she inspected the ten square packets and found 29 orange strips marked "A8" and 20 orange strips marked "N8" for a total of 49 strips. Lesiak's testing of samples from both groups of strips revealed that they each contained a mixture, comprised of the Schedule III controlled substance buprenorphine and the Schedule VI controlled substance naloxone. These substances, when combined, form suboxone.[3]

As part of the investigation, Deputy Hamlett listened to the recorded jail calls Hope made the week before the encyclopedia arrived. The recordings were kept in the ordinary course of business and stored for four years unless downloaded by a custodian of record. Custodians must be granted access to the recordings and cannot alter them.

To conduct a call at the jail, inmates must input their assigned state number and a four-digit randomly assigned personal identification number. However, inmates were known to exchange their identification numbers. Once the inmate placed a call, both he and the party

---

[3] Lesiak also testified that "[s]uboxone is . . . like a brand name like, like for example Bayer aspirin as opposed to regular." Additionally, Code § 54.1-3450(3)(a) states that any material, compound, mixture, or preparation containing buprenorphine is a Schedule III controlled substance.

called are notified that the call is being recorded and monitored. The system identifies the specific phone in a housing unit where the inmate placed the call, the phone number called, the length of the conversation, and when the time the call was initiated. Each inmate was allowed 15 approved phone numbers on a call list, and different inmates are permitted to have the same number on their list of approved phone numbers.

Deputy Hamlett determined that Hope used another inmate's identification number to make several calls to his nephew, Neo.[4] Deputy Hamlett noted that he was familiar with Hope's voice and recognized it on the recorded calls to Neo. Additionally, Deputy Hamlett viewed surveillance footage from inside the jail for the dates and times of the calls to Neo and verified Hope was the inmate making the calls. Deputy Hamlett acknowledged, however, that he failed to download or otherwise preserve the surveillance footage of the calls.

During the calls, as recorded and played for the jury, Hope told Neo how to package items so that they did not dry out, to apply tape to the cardboard, and to glue the cardboard so that the book looked as if it were new. Hope continuously reminded Neo to mail the package by Friday, April 17, 2020, to send it via express so it could be tracked, to include both his name and state prisoner number on the package, and to mark the box with the correct return address.

On June 5, 2020, Deputy Hamlett interviewed Hope and after being *Mirandized*,[5] Hope agreed to speak with Deputy Hamlett. During the interview, Deputy Hamlett explained that a package addressed to Hope and containing suboxone had been delivered to the facility. Initially, Hope did not speak and appeared nervous. Deputy Hamlett then read Hope transcriptions from the recorded jail calls and informed Hope he knew Neo had sent him the package. Hope "looked sad" and asked to speak with the case's lead agent to "fix this problem." On cross-examination,

---

[4] Neo's surname was never disclosed at trial.

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Deputy Hamlett acknowledged that the interview was not recorded and that Hope had not written a statement.

Master Special Agent C.A. O'Der, an agent with the Department of Corrections Special Investigations Unit, testified as an expert in drug possession and distribution within the inmate population of the Department of Corrections. Special Agent O'Der explained that strips of suboxone received at correctional facilities were "thin[ner] [than a] piece of chewing gum . . . very similar to Listerine breath strips . . . 'a little bit thicker'"; the strips often were wrapped in cellophane to retain moisture and, thus, their resale value in the prison. Special Agent O'Der opined that possession of 49 strips of suboxone was inconsistent with possession for personal use. Special Agent O'Der noted that one strip of suboxone was worth approximately $100 in prison; the strips were often divided into four to five pieces and then each piece was sold individually. Thus, the strips recovered from the encyclopedia sent to Hope had a resale value of almost $5,000.

Hope testified in his own defense. Hope admitted he was a felon, had been convicted of crimes of moral turpitude, and, at the time of trial, was an inmate at Green Rock Correctional Center. Hope acknowledged that he had an interview with Hamlett and that he had asked Hamlett how he could fix the situation. Hope asserted, however, that his inquiry was not a confession but rather a request to speak with the lead investigator because he knew Deputy Hamlett no longer controlled the investigation. Hope denied he was the inmate on the recorded calls and any knowledge of the package. He also asserted that he had been framed.

III. Jury Instructions

At the conclusion of the evidence, the parties discussed jury instructions with the court in chambers. When the parties returned to open court, the trial court noted that it had rejected two jury instructions, denoted as Instruction A[6] and Instruction B,[7] over Hope's objection.

Hope argued that proffered Instruction A should be given because his interview with Deputy Hamlett was akin to a custodial interrogation and was not recorded. Thus, he argued, the jury should be instructed that it could consider the absence of recording when determining the weight to give the statements he made during the interrogation. Regarding Instruction B, Hope argued that it should have been given because the indictments specified that he conspired to possess and distribute buprenorphine and naloxone to an inmate. Consequently, he contended, the Commonwealth was required to prove that he conspired to possess and distribute those specific drugs.

The trial court rejected Instruction A as irrelevant because there was no law enforcement officer who testified that the interview constituted custodial interrogation. The trial court found

---

[6] Instruction A stated: "The Court instructs the jury that the failure of law enforcement to record a custodial interrogation that occurred at a place of detention is a circumstance you may consider, along with other evidence, in determining the weight you give to statements made by the defendant."

[7] Instruction B stated:

> The Court instructs the jury that knowledge that a substance distributed is Buprenorphine and Naloxone is an element of the crime of attempting to possess with the intent to distribute. Thus, you may not find the defendant guilty of such crime unless you believe beyond a reasonable doubt that he was aware that the substance he attempted to distribute was Buprenorphine and Naloxone.

Instruction B was superfluous because accepted Instruction 17,[8] was a substantially similar model instruction that required the Commonwealth to prove that Hope conspired to possess and distribute Schedule III drugs.

After closing arguments, the jury convicted Hope of the charges and the trial court imposed an active sentence of five years of incarceration. Hope appeals.

ANALYSIS

I. Motion to Continue

Hope contends that the trial court erred when it denied his oral motion to continue the trial on February 13, 2023. Whether to grant or deny "a motion for a continuance is within the sound discretion of the circuit court and must be considered in view of the circumstances unique to each case." *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007). A party challenging a circuit court's denial of a motion for a continuance must demonstrate both an "abuse of discretion *and* resulting prejudice[.]" *Id.*

The abuse of discretion standard "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013). It necessarily presumes that "for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable." *Thomas v. Commonwealth*, 62 Va. App. 104, 111 (2013) (quoting *Hamad*, 61 Va. App. at 607). It requires an appellate court to "show enough deference to a primary decisionmaker's judgment that

---

[8] Instruction 17 stated:

> Knowledge that the substance attempted to be distributed is a Schedule III controlled substance is an element of the crime of possessing with intent to distribute. Thus, you may not find the defendant guilty of such crime unless you believe beyond a reasonable doubt that he was aware that the substance he attempted to distribute was a Schedule III controlled substance.

- 8 -

the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013) (quoting *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008)). Accordingly, "we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports the trial court's action." *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Beck v. Commonwealth*, 253 Va. 373, 385 (1997)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

Here, before the scheduled date for Hope's jury trial, the matter had been continued twice on Hope's request. Although Hope claimed that he had not talked to his trial counsel, Hope's attorney attested that he had spoken to Hope before trial. Additionally, although Hope argued that he wanted his trial counsel to investigate the existence of the jail call surveillance footage, his attorney asserted that he had already attempted to recover the surveillance footage; the footage no longer existed. Despite the absence of this evidence, Hope's trial counsel asserted that he was ready to try Hope's case. Based on these circumstances, the trial court did not abuse its discretion when it denied Hope's oral motion on the morning of trial.

## II. Jury Instructions

Hope contends that the trial court erred when it failed to give his proffered jury instructions. "A reviewing court's responsibility in reviewing jury instructions is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). The trial court may refuse an otherwise proper instruction if other instructions fully and fairly cover the relevant principle of law. *Howsare v. Commonwealth*, 293 Va. 439, 443 (2017). "Whether to give or deny jury instructions 'rest[s] in the sound discretion of the trial

court.'" *Hinton v. Commonwealth*, 293 Va. 293, 302 (2017) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "[W]hether a jury instruction accurately states the relevant law is a question of law that we review de novo." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

"[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Id.* (quoting *Payne*, 292 Va. at 869). As the challenged instructions were offered by Hope, the burden was on him to show that the proposed instructions were a "correct statement of the law, applicable to the facts of the case on trial, and expressed in appropriate language." *Miller v. Commonwealth*, 64 Va. App. 527, 547 (2015) (quoting *Shaikh v. Johnson*, 276 Va. 537, 546 (2008)).

### A. Instruction A

Hope contends that the trial court erred when it refused his proffered Instruction A. Hope appears to contend that his interview with Deputy Hamlett was a custodial interrogation. He asserts that Deputy Hamlett met the broad definition of a law enforcement officer in Code § 18.2-57(G).[9] Consequently, Hope appears to argue that the jury should have been instructed under Code § 19.2-390.04(C) that it could have considered the absence of a recording during their deliberations.

Assuming without deciding that Deputy Hamlett qualified as a law enforcement officer under Code § 18.2-57(G) and the interview constituted a custodial interrogation, the trial court did not err in refusing Instruction A. Code § 19.2-390.04(B) requires law enforcement officers conducting a custodial interrogation to "cause an audiovisual recording of the entirety of such

---

[9] Code § 18.2-57(G)'s definition of a "law enforcement officer" includes "any employee with internal investigations authority designated by the Department of Corrections pursuant to subdivision 11 of § 53.1-10, and such officer also includes jail officers in local and regional correctional facilities." Below, Hope focused his argument on his status as an incarcerated person, equating that to being "in custody" for the purposes of *Miranda*, but failed to argue that Deputy Hamlett qualified as a "law enforcement officer" pursuant to Code § 18.2-57(G).

custodial interrogation to be made" or "an audio recording of such custodial interrogation to be made" if "an audiovisual recording" cannot be made. "The failure of a law-enforcement officer to cause an audiovisual or audio recording to be made . . . shall not affect the admissibility of the statements made by the subject of the custodial interrogation, but such failure may be considered in determining the weight given to such evidence." Code § 19.2-390.04(C). Code § 19.2-390.04, however, was not in effect until July 1, 2020, which was after the challenged June 5, 2020 interview. *See* 2020 Va. Acts ch. 1126.

"The 'usual rule' regarding a new statute is 'that legislation is . . . prospective' only." *Street v. Commonwealth*, 75 Va. App. 298, 305 (2022) (alteration in original) (quoting *Martin v. Hadix*, 527 U.S. 343, 357 (1999)). "The retroactivity of statutes is disfavored." *Id.*; *see McCarthy v. Commonwealth*, 73 Va. App. 630, 647 (2021). "A statute is retroactive only if the legislature includes an express provision or other clear language indicating that it applies retroactively." *Street*, 75 Va. App. at 305; *see Washington v. Commonwealth*, 216 Va. 185, 193 (1975). Code § 19.2-390.04 does not contain an express statement indicating that it applies retroactively. Thus, the trial court did not err when it declined to instruct the jury of the considerations contained in Code § 19.2-390.04 as it was not in effect at the time of the interview.

### B. Instruction B

Hope argues that the trial court erred when it failed to give his proffered instruction about the required element of knowledge and instead gave Instruction 17. He contends that the Commonwealth was required to prove his specific knowledge of the exact nature of the Schedule III controlled substance because the indictments "added language to describe the nature of the Schedule III controlled substance more precisely."

"[T]o convict a person of illegal drug possession, the Commonwealth must prove beyond a reasonable doubt that the accused was aware of the presence and character of the drug and that

- 11 -

the accused [intentionally and] consciously possessed it." *Yerling v. Commonwealth*, 71 Va. App. 527, 532 (2020) (citing *Jones v. Commonwealth*, 17 Va. App. 572, 574 (1994)). But the Commonwealth need not prove that the accused knew the "precise identity" of the specific controlled substance in his possession, only that the substance was a "controlled substance." *Sierra v. Commonwealth*, 59 Va. App. 770, 783 (2012). "Such knowledge may be shown by evidence of the acts, statements or conduct of the accused" and "[o]ther circumstantial evidence." *Young v. Commonwealth*, 275 Va. 587, 591 (2008).

The Commonwealth was not required to prove Hope knew the precise identity of the Schedule III drugs he attempted to possess as an element of the charged offenses. Rather, the Commonwealth was only required to prove that Hope was aware that the material was a controlled substance when he conspired and attempted to possess it.

Here, the evidence shows that during recorded jail calls with Neo, Hope instructed Neo on how to wrap the strips in cellophane so that they did not dry out and to conceal those wrapped strips in the spine of a book. This evidence supports the inference that Hope knew he was attempting to possess controlled substances, namely buprenorphine and naloxone (combined to form suboxone), and that he had knowledge of the specific characteristics of that particular drug, namely the necessity of care when packing the drug to prevent it from drying out. Hope's knowledge of the suboxone's character as containing the prohibited substances of buprenorphine and naloxone was established by the steps taken by Neo, on Hope's instruction, to prevent it from being discovered and intercepted. Ultimately, the confiscated package contained strips of suboxone wrapped in the manner that Hope had instructed Neo to use and concealed in a book. Because Instruction 17 fully addressed the correct principle of law, the trial court did not abuse its discretion when it declined to give Hope's proffered instruction on his knowledge of possession of Schedule III drugs.

- 12 -

III. Chain of Custody

In his third assignment of error, Hope argues that the trial court erred when it admitted the strips of suboxone found and the certificate of analysis because the Commonwealth failed to establish the requisite chain of custody. We review the trial court's determination regarding the adequacy of the chain of custody for abuse of discretion. *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012).

Hope acknowledges that both Deputy Hamlett and Lesiak testified that the package they handled and received did not appear to have been altered. He argues, however, that the record is unclear who originally opened the package and how Deputy Hamlett obtained possession of it. Hope further notes that the Commonwealth failed to establish how the evidence was transported to the trial court for trial.

"In proving the chain of custody, '[t]he Commonwealth must . . . account for every "vital link in the chain of possession."'" *Hargrove v. Commonwealth*, 53 Va. App. 545, 554 (2009) (alterations in original) (quoting *Alvarez v. Commonwealth*, 24 Va. App. 768, 777 (1997)). But "[a] court need not hear . . . from every witness who physically handled the samples for the [evidence] to be admissible." *Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006), *aff'd on other grounds*, 274 Va. 469 (2007). Rather, the Commonwealth "need only provide 'reasonable assurance' that the evidence obtained by the police was the same evidence tested." *Id.* (quoting *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999)). "[W]here there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight of the evidence." *Jeter v. Commonwealth*, 44 Va. App. 733, 739 (2005) (quoting *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990)).

Here, the Commonwealth proved "every 'vital link in the chain of possession.'" *Hargrove*, 53 Va. App. at 554 (quoting *Alvarez*, 24 Va. App. at 777). Gibbs testified that she retrieved mail

from the Chatham post office, returned to the Green Rock Correctional Center, and set packages along a hallway for a trained police dog to inspect. When Officer Henderson walked his canine along the hallway, the dog alerted to a package addressed to Hope. Although Officer Henderson could not recall who opened the package, he testified that he personally observed officers open the package and took photographs of the process.

Within the package, officials found an encyclopedia. The spine of the encyclopedia contained ten individually wrapped square packets that were orange in color. After finding the suspected narcotics, Deputy Hamlett placed the contraband in an evidence bag, sealed it with red tape, initialed the bag, and placed the sealed bag in an evidence locker. Deputy Hamlett noted that only he and one other investigator could access the evidence locker. Several days later, Deputy Hamlett retrieved the evidence bag and delivered it to the lab for testing.

At trial, both Officer Henderson and Deputy Hamlett attested that they recognized the package as the item they had seized and the orange packets as the items that they had found in the encyclopedia's spine.

Lesiak testified that she opened the evidence bag and discovered 10 orange packets on a piece of cardboard. The 10 packets contained 49 individually wrapped strips marked with either an A8 or an N8. Testing of an A8 strip and an N8 strip confirmed that each strip contained the Schedule III drug buprenorphine combined with naloxone, which together constitutes the substance commonly known as suboxone. After testing, Lesiak sealed the package with yellow tape and prepared a report of her findings. When shown the package and orange packets at trial, Lesiak noted that the evidence was still sealed by the yellow tape she had used and attested that the orange packets were the drugs she tested. When shown the certificate of analysis at trial, Lesiak confirmed that her signature was on the certificate and that "the laboratory number on the certificate corresponded to the laboratory number on the evidence."

Any inconsistencies relating to the chain of custody that Hope asserts relate only to the weight of the evidence and not to the admissibility of the suboxone and the certificate of analysis. Thus, the Commonwealth "provide[d] 'reasonable assurance' that the evidence obtained by the police was the same evidence tested." *Anderson*, 48 Va. App. at 717 (quoting *Vinson*, 258 Va. at 469). Accordingly, the trial court did not abuse its discretion in admitting the suboxone and the certificate of analysis showing that the suboxone strips were made up of buprenorphine and naloxone.

## IV. Sufficiency of Evidence

Hope contends that the evidence was insufficient to support his convictions. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

In challenging his conviction for attempting to possess a Schedule III controlled substance with the intent to distribute, Hope contends that the Commonwealth failed to prove that each strip contained a controlled substance because Lesiak did not test all 49 strips found.

Thus, he contends, the dosage confirmed to contain controlled substances—two strips—could have been for personal use. Hope denies any knowledge that the package was being sent to him or that the package contained controlled substances. He further claims that the entire proof that he was the inmate on the recorded jail calls is based on Deputy Hamlett's testimony, which he asserts was incredible.

In challenging his conspiracy convictions, Hope continues to deny making the recorded jail calls, confessing to Deputy Hamlett, or knowledge of the controlled substances in the package addressed to him. Hope further asserts that it was pure speculation that the jail calls corresponded to the seized package as there was no mention of drugs or contraband on the calls. Additionally, Hope contends that there was no evidence that he "made [a] call or entered into an agreement with anyone." Finally, Hope asserts that the Commonwealth failed to prove that he intended to distribute the controlled substances to another inmate.

"An attempt to commit a crime is composed of two elements: (1) The intent to commit it; and (2) a direct, ineffectual act done towards its commission." *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "The intent required to be proven in an attempted crime is the specific intent in the person's mind to commit the particular crime for which the attempt is charged." *Id.* (quoting *Wynn v. Commonwealth*, 5 Va. App. 283, 292 (1987)). "[T]he fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." *Id.* (alteration in original) (quoting *Moody v. Commonwealth*, 28 Va. App. 702, 706-07 (1998)). "Determining intent is 'generally a question for the trier of fact.'" *Id.* (quoting *Haywood*, 20 Va. App. at 565).

For an attempted crime, "[t]he direct but ineffectual act is commonly referred to as an 'overt act.'" *Jones v. Commonwealth*, 70 Va. App. 307, 318 (2019) (en banc) (quoting *Jay v. Commonwealth*, 275 Va. 510, 525 (2008)). Under the common law, the overt act "must possess

four characteristics: first, it must be a step toward a punishable offense; second, it must be apparently (but not necessarily in reality) adapted to the purpose intended; third, it must come dangerously near to success; fourth, it must not succeed." *Id.* at 317-18 (quoting J. H. Beale, Jr., *Criminal Attempts*, 16 Harv. L. Rev. 491, 492 (1903)). "While the overt acts of the accused [need not be] the last proximate acts necessary to the consummation of the crime, they [must be] direct overt acts well calculated to accomplish the result intended." *Id.* at 323 (alterations in original) (quoting *Jay*, 275 Va. at 526).

To obtain a conviction for conspiracy to deliver a controlled substance to an inmate, the Commonwealth must prove that the defendant "willfully" "conspire[d] with another" person to deliver the drugs. Code § 18.2-474.1. "Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). When the evidence demonstrates that the defendants "*pursued the same object*, one performing *one part* and the others performing *another part* so as to complete it or with a view to its attainment, the [factfinder] will be justified in concluding that they were engaged in a conspiracy to effect that object." *James v. Commonwealth*, 53 Va. App. 671, 678 (2009) (alteration in original) (quoting *Charity v. Commonwealth*, 49 Va. App. 581, 586 (2007)).

"A conspiratorial agreement 'often may only be established by circumstantial and indirect evidence including the overt actions of the parties.'" *Carr v. Commonwealth*, 69 Va. App. 106, 119 (2018) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)). "It is a rare case where any 'formal agreement among alleged conspirators' can be established." *James*, 53 Va. App. at 678 (quoting *Wilder Enters., Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1141 (4th Cir. 1980)).

"It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). Circumstantial evidence probative of intent to distribute may include quantity of drugs seized, packaging, presence of unusual amount of cash, and drug paraphernalia or equipment related to distribution. *Id.*

In addition, "the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Case v. Commonwealth*, 63 Va. App. 14, 23 (2014) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Holloway v. Commonwealth*, 57 Va. App. 658, 666 (2011) (quoting *Emerson*, 43 Va. App. at 277). "[I]n considering an appellant's alternate hypothesis of innocence in a circumstantial evidence case, we must determine 'not whether there is some evidence to support' the appellant's hypothesis of innocence, but, rather, 'whether a reasonable [juror], upon consideration of all the evidence, could have rejected [the defendant's] theories in his defense . . . .'" *Id.* at 665 (first alteration in original) (quoting *Emerson*, 43 Va. App. at 277). "By finding [a] defendant guilty, therefore, the factfinder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" *Ray v. Commonwealth*, 74 Va. App. 291, 308 (2022) (quoting *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (alteration in original)).

Finally, "[t]he sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v.*

*Commonwealth*, 67 Va. App. 519, 529-30 (2017)). Moreover, "the conclusions of the fact finder on issues of witness credibility may be disturbed on appeal only when we find that the witness' testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Ashby v. Commonwealth*, 33 Va. App. 540, 548 (2000) (quoting *Fisher v. Commonwealth*, 228 Va. 296, 299-300 (1984)). "In all other cases, we must defer to the conclusions of 'the fact finder[,] who has the opportunity of seeing and hearing the witnesses.'" *Id.* (alteration in original) (quoting *Schneider v. Commonwealth*, 230 Va. 379, 382 (1985)). In finding Hope guilty, the jury credited the Commonwealth's evidence and rejected his claim that he was not the inmate on the recorded jail calls and that he was unaware of the package and its contents. *See Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (finder of fact is entitled to conclude that the defendant is lying to conceal his guilt).

The totality of the circumstances supports the jury's conclusion that Hope participated in a conspiracy and attempted to possess controlled substances with the intent to distribute it to inmates at the Green Rock Correctional Center. The evidence showed that Hope participated in multiple phone calls with Neo where he instructed Neo how to wrap an item, tape the item to cardboard, and reassemble a book. Hope stated that the item had to be wrapped so that no air could get in and dry the item out. Special Agent O'Der testified that suboxone can easily dry out if not packaged correctly. Hope also instructed Neo to take his time while assembling the package, including flipping through the book to ensure it looked like new. Further, Hope directed Neo how to address the package to him and send the package via express mail so it could be tracked on or before Friday, April 17, 2020.

On the day the package was sent, Neo confirmed in a phone call with Hope that he had done as Hope had instructed and that the package had been sent. Shortly after these conversations occurred, officials intercepted a package sent to Hope containing 49 strips of

suboxone that were pre-packaged, organized, and concealed in the exact manner that Hope and Neo had discussed in the recorded jail calls. Special Agent O'Der, an expert in drug distribution among the imprisoned population, testified that the amount of suboxone in the package was inconsistent with possession for personal use and had a resale value of almost $5,000 inside the prison.

In the days following the package's mailing, Hope and Neo discussed the package's failure to arrive. Although Hope initially denied any knowledge of the package or that it contained contraband, he later stated his desire to talk to the lead investigator so that he could "fix this problem" and appeared to be nervous.

Although the term suboxone was never mentioned in the recorded jail calls, a reasonable factfinder could conclude that Hope was the inmate on the calls, he knew the character and nature of the suboxone hidden in the book, and he directed the packaging of the drugs in a manner designed to retain moisture and avoid detection. As articulated above, the circumstantial evidence presented at trial supports the inference that Hope knew he was attempting to possess buprenorphine combined with naloxone and the details attributed to him on the phone calls reflect his knowledge of the specific characteristics of that particular drug, namely the necessity of care when packing the drug to prevent it from drying out. Further, Hope's knowledge of the buprenorphine and naloxone's character as prohibited substances was established by the steps taken by Neo, on Hope's instruction, to prevent it from being discovered and intercepted. However, the only reason Hope did not obtain possession of the suboxone strips is because officers intercepted the package before it was delivered to him.

Further, the large quantity of suboxone worth nearly $5,000, could lead a reasonable factfinder to conclude that Hope intended to distribute the suboxone strips to other inmates. Although Lesiak did not test every strip recovered from the encyclopedia, it is a reasonable

inference that the untested items where the same as the tested items which had been marked and packaged together.  Accordingly, the evidence in this case, viewed in its totality with all reasonable inferences drawn therefrom, supports the jury's verdicts that Hope willfully participated in the conspiracy to deliver the controlled substances to Green Rock Correctional Center and attempted to possess the controlled substances with the intent to distribute it to other inmates.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*